Dwane A. Washington Reg. No. 80115-083
U.S. Penitentiary Tucson
P.O. Box 24550
Tucson, AZ 85734
Pro Se

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

CV18-0302 TUCCKJ--(EJM)

Dwane A. Washington,       )   Case No. _____
            Petitioner,    )
     v.                    )
R.L. Rhodes,               )
            Respondent.    )

[Proposed] ORDER

On June ____, 2018, the Court considered Petitioner Dwane Washington's Request for a Temporary Restraining Order in relation to his Petition for Writ of Habeas Corpus.

Finding that temporary injunctive relief is required to maintain the status quo and prevent irreparable harm to Mr. Washington, the Court hereby ORDERS that Respondent refrain from transferring Petitioner to any other prison, pending further proceedings in this matter. Nothing in this Order prevents Mr. Washington's transfer within his current institution, including transfer to or from the general prison population, or Mr. Washington's temporary transfer to a local medical facility for care as needed.

[Date]                              [Signature and Seal]

Declaration of Matthew Muller In Support of          Page 1 of 3
Dwane Washington's Habeas Corpus Petition

I, Matthew Muller, swear under penalty of perjury:

1. My name is Matthew Muller and I am an inmate at U.S. Penitentiary Tucson. I have been housed in that institution's Special Housing Unit (SHU) near Dwane Washington for approximately one month.

2. I have questioned Mr. Washington about the facts contained in his petition and helped him formulate them as legal claims. In general, Mr. Washington's factual assertions are consistent with my own observations and experience.

3. I can directly corroborate the living conditions in the SHU that Mr. Washington describes. Sanitary conditions fall well below the minimum standards required for human health. I have had my cell inundated with sewage for which we were given no supplies to clean up. My linens have blood stains on them and I have contracted ringworm, possibly from the linens or from other surfaces in the SHU. Insect infestations are common and I have been bitten about 40 times by one sort of bug or another in the course of a month. Correctional officers are careless of inmate safety in the SHU and I have been assaulted twice. Medical care is generally harder to obtain in the SHU, as is access to legal materials. The forms on which Mr. Washington is making his claims were requested from prison staff, but refused. Ultimately they were mailed to me by my wife for Mr. Washington's use.

4. I can also indirectly corroborate Mr. Washington's claims concerning S.I.S. investigations and Officer Galleon. In general, it can be dangerous to speak with S.I.S. officers, because other inmates will assume you are providing information to be used against other inmates. You will be labeled a "snitch" and likely attacked. I have also heard from other inmates that Officer Galleon employs illegal tactics in his investigations and even that he himself is involved with smuggling contraband into the prison for sale to inmates. I have no opinion about whether these claims are true. But it is true that many inmates seem to believe they are true and try to avoid all contact with Officer Galleon.

5. It is also true that S.I.S. investigators retaliate against inmates by placing them in the SHU. I am a former attorney and was threatened that I would be placed in the SHU and transferred to another prison if I continued helping inmates with their legal work. I continued and indeed was eventually placed in the SHU on false charges. Some charges were simply untrue (e.g. that I was charging inmates to work on their cases) and some were gross exaggerations (e.g. that it amounted to criminal activity for me to advise another inmate that his family could use social media in support of their loved one's innocence campaign). In any event, I know of multiple cases in which prison authorities used false or pretextual charges to control inmates' lawful activities or to force them to do something they would not ordinarily be required to do.

6. It is also true, as stated by Mr. Washington, that he would be

unsafe if transferred to certain prisons, and that this fact is well understood by staff. In the Bureau of Prisons, facilities where prison gangs are active are called "active yards" and facilities where ex-gang members and others who do not wish to be around gangs are called "drop-out yards." It is generally known that any inmate with a sex-related charge will be attacked at an active yard, because the gangs believe that sex offenders are not "true convicts." The upshot is that any actual or perceived sex offender transferred to an active yard will be attacked while in general population and will be forced to live in the SHU there under restrictive conditions, for his own protection. He may eventually be transferred back to a drop-out yard, but in the meantime will spend many months or even years in transit from one temporary facility to another. Inmates and staff call this treatment "diesel therapy," and it is not uncommon for BOP staff to threaten inmates with such treatment — sometimes without intent to follow through, but sometimes in earnest. It would appear that Mr. Washington's case falls into the latter category.

I, Matthew Muller, swear under penalty of perjury that the foregoing is true and correct. Done this eleventh day of June, 2018, in Tucson, Arizona.

Signed: *(signature)*
Matthew Muller